[Civil No. 2872. Filed October 22, 1931.]

[4 Pac. (2d) 369.]

MARICOPA COUNTY MUNICIPAL WATER CONSERVATION DISTRICT NUMBER ONE, a Corporation, BEARDSLEY LAND AND INVESTMENT COMPANY, a Corporation, and CARL PLEASANT, Appellants, v. SOUTHWEST COTTON COMPANY, a Corporation, and VALLEY RANCH COMPANY, a Corporation, Appellees.

66

Messrs. Hayes, Stanford, Walton, Allee & Williams and Messrs. Kibbey, Bennett, Gust, Smith & Rosenfeld, for Appellants.

Mr. James R. Moore, for Appellees.

Mr. O. J. Baughn, Messrs. Sloan, Holton, McKesson & Scott, Messrs. Chalmers, Fennemore & Nairn, and Mr. U. T. Clotfelter, *Amici Curiae.*

LOCKWOOD, J.—Southwest Cotton Company, a corporation, and Valley Ranch Company, a corpora-

tion, hereinafter called plaintiffs, brought suit against Maricopa County Municipal Water Conservation District No. 1, a corporation, Beardsley Land & Investment Company, a corporation, and Carl Pleasant, hereinafter called defendants, for the purpose of enjoining the latter from storing and using for irrigation certain surface waters of the Agua Fria River. A judgment was finally rendered, granting an injunction upon certain terms set forth therein, and from said judgment this appeal has been taken.

The case is one of the most important which has ever come before this court, involving as it does not only property interests of the value of many millions of dollars, but also a declaration of legal principles which will in all probability determine and govern to a great extent the course of future agricultural development within the arid regions of Arizona. The real question involved is the law applicable to the relative rights to the ownership and use of the subterranean waters of the state as against those of the surface waters. We have discussed certain phases of this question in previous cases, but have never made a complete statement of the principles applying thereto, for the reason that heretofore the development of the subterranean waters has been of comparatively minor importance. We think, however, this case is proof that the time has come when it is necessary for the protection and guidance of future agricultural development in the state that these principles should be enunciated as clearly and definitely as possible, so that our citizens may know how to guide their future procedure. For this reason we treat the matter as though it were of first impression in all respects, not only considering the new issues which have arisen, but reconsidering and redetermining the old ones upon which we have heretofore expressed an opinion. The case has been most carefully

and exhaustively briefed by counsel so that we feel every possible angle and every authority bearing thereon has been called to our attention. We have considered every point raised and examined every case cited, and, if we have not mentioned and discussed them all, it is because, in view of the conclusions we have reached, it is unnecessary, and would extend this opinion to unreasonable length.

The area which is now the state of Arizona was acquired from the Republic of Mexico in 1848 and 1853. At that time the United States succeeded to the sovereignty which was previously held by Mexico, with the same right to alter or amend the existing laws, or establish new ones, as that previously held by the latter. *Boquillas etc. Co.* v. *St. David etc. Assn.*, 11 Ariz. 128, 89 Pac. 504, affirmed 213 U. S. 339, 53 L. Ed. 822, 29 Sup. Ct. Rep. 493; *Lux* v. *Haggin*, 69 Cal. 255, 4 Pac. 919, 10 Pac. 674. On the other hand, in the absence of affirmative action by the United States or its agencies, the territory, and afterwards the state, of Arizona, the law existing in Arizona at the time of its acquisition is presumed to continue unchanged. *Lux* v. *Haggin, supra; Clough* v. *Wing*, 2 Ariz. 371, 17 Pac. 453. What, then, was the existing law in Arizona at the time of its acquisition by the United States, in regard to the ownership and use of water, surface and subterranean alike?

There are two great systems of law recognized in Western civilization: The common law, pertaining particularly to the English-speaking countries, and the civil law, which is found principally in those nations where the influence of the old Roman law from which it comes is, and has been, the strongest. Both of these systems distinguish between well-defined natural streams and bodies of water on the one hand, and subterranean, percolating waters on the other. So far as the second are concerned, the prin-

ciple governing them was, originally at least, the same under both systems. All rights to subterranean waters not flowing in definite, known channels belonged to the owners of the soil. Dig. 39, title 3, §§ 1, 12, 21; Code 3, title 34, §§ 4, 6; *Acton* v. *Blundell,* 12 Mees. & W. 324, 152 Eng. Reprint, 1223. But, as far as other waters were concerned, while both laws recognize that the title to the *corpus* of running water could not be acquired by any individual so long as it was in its natural channel, the common law adopted as governing the use of such waters what is known as the doctrine of riparian rights, the fundamental principle of which was that the water could be used by riparian proprietors alone, and by them only in such a manner, aside from strictly domestic purposes, as not to diminish or alter the course or quantity of the waters of the stream to the deprivation or injury of the other riparian proprietors. *Miner* v. *Gilmour,* 14 Eng. Rep. 861, 12 Moore, 131. Navigable waters were, under the common law, considered as under the exclusive control of the government, in trust for the general public, so far as the rights of navigation, etc., were concerned, but were otherwise subject to the usual riparian rights of owners of adjoining lands.

The Roman law, while in many respects accepting the same rules as to riparian rights as the common law, also recognized the acquisition, through prescription, deed or through a grant from the government, of a right to divert the waters of both navigable and non-navigable streams by either riparian or non-riparian proprietors. Code 3, title 34, § 7; Code 11, title 42, § 4; Dig. 8, title 3, § 2, 1 and 2; Dig. 43, title 13, §§ 1–3. Dig. 43, title 20, §§ 1, 40–42. The sole restriction was that, if the stream were originally navigable, such navigability could not be destroyed by the diversion. Dig. 39, title 3, § 10, 2.

These principles of the Roman law were followed in Spain for many centuries, though in "Las Siete Partidas," the famous Spanish Code, formulated about 1256, only the rule applying to percolating subterranean water was specifically discussed, and Spanish water law, as modified from time to time, was brought to Mexico, when it was first settled by the Spaniards. Its principles, as modified by local custom and statute, have been exhaustively discussed by the Supreme Court of California in the famous case of *Lux* v. *Haggin, supra,* and it would be a work of supererogation for us to attempt to add anything thereto. The conclusions of that court regarding rights to the use of nonpercolating waters, as they existed at the time of the acquisition of the Western territories by the United States, may be summed up as follows:

"It would seem to be in the *power* of the sovereign (except so far as the power is limited by the constitution of government) to authorize such diversions as shall interfere with navigation. . . .

"The waters of innavigable rivers, while they continued such, were subject to the common use of all who could legally gain access to them for purposes necessary to the support of life, but the Mexican government possessed the power of retaining the waters in their natural channel, or of conceding the exclusive use of portions of them to individuals or corporations, upon such terms and conditions, and with such limitations, as it saw fit to establish by law."

These conclusions, so far as they pertain to nonnavigable streams, were referred to and quoted approvingly by the Supreme Court of the territory of Arizona in the case of *Boquillas etc. Co.* v. *St. David etc. Assn., supra,* and in reason we think those referring to navigable waters are equally correct. It appears, then, beyond doubt that the doctrine of prior appropriation was entirely unknown to the common

law, and under the Mexican law arose *only as a result of a grant from the government.* 1 Kinney on Irrigation, 2d ed., p. 1044. How, then, did it become a part of the law of Arizona?

When the territory of Arizona, which formerly was part of the state of Sonora, Mexico, was first organized, the right of appropriation of surface streams for irrigation purposes was to some extent permitted by local custom as well as by express grant. So far as percolating waters are concerned, there is nothing to show that a right of appropriation of these was ever exercised or claimed to exist as a matter of custom in Arizona or Sonora before its acquisition by the United States, and the only rules specifically touching upon subterranean waters were the principles laid down in Las Siete Partidas to the effect that the owner of the land owned them to the extent that he could draw them from his land at will, even though by so doing it cut off the subterranean supply previously used by other land owners, with the exception that the government could by grant authorize the appropriation of even these waters, if they ran in definite channels. Partidas 3, Tit. 32, § 19; Nov. Recopilacion, Tit. 3; Tit. 11, Lib. 7, Law 27, § 48.

We conclude, therefore, that at the time the territory of Arizona was acquired from Mexico the government of the United States, and its agent, the government of Arizona, had the right to dispose of and regulate the use of all waters of every nature, both surface and subterranean, in the dual capacity as sovereign and as proprietor of the public domain, unhampered by any rules of either the civil or the common law, or by any previous general custom which had theretofore existed, subject only to such vested rights to the use of *specific* waters as had been acquired, either formally from the Mexican government or impliedly as a result of local custom, and to

the right of use of all percolating, subterranean waters underlying lands then in private hands by the owners of such lands.

The matter was called to the attention of the first legislature of the territory of Arizona by Governor Goodwin, in the following language:

"You may also deem it advisable at this time, before rights become vested, to adopt a permanent policy as to the use of water for agricultural as well as mining purposes. Where water is scarce and valuable it is important to provide against monopolies, and that it should be used as much as possible for the common good."

The legislature responded by adopting article 22 of the Bill of Rights, which reads as follows:

"All streams, lakes, and ponds of water capable of being used for the purposes of navigation or irrigation, are hereby declared to be public property; and no individual or corporation shall have the right to appropriate them exclusively to their own private use, except under such equitable regulations and restrictions as the Legislature shall provide for that purpose."

In pursuance of this article the same legislature, at the same session, inserted in chapter 55 of Howell's Code the following provision:

"Section 1. All rivers, creeks and streams of running water in the Territory of Arizona are hereby declared public, and applicable to the purposes of irrigation and mining, as hereinafter provided.

"Sec. 2. All rights in acequias, or irrigating canals, heretofore established shall not be disturbed, nor shall the course of such acequias be changed without the consent of the proprietors of such established rights.

"Sec. 3. All the inhabitants of this Territory, who own or possess arable and irrigable lands, shall have the right to construct public or private acequias, and obtain the necessary water for the same from

any convenient river, creek or stream of running water.''

What is the effect of the Bill of Rights and these sections of Howell's Code on the use of water in Arizona?

Bearing in mind the language in the message of Governor Goodwin above quoted, and the fact that the Bill of Rights and Code were adopted by the same legislature, at the same session, we are of the opinion there can be no possible doubt the legislature had in mind the conflicting rules of the common law and the doctrine of prior appropriation, and intended to and did declare the fundamental principles which should govern the use of water in Arizona for the future. This declaration amounted to a statutory repudiation of the doctrine of riparian rights and an establishment of the so-called doctrine of prior appropriation as suited to the conditions prevailing in Arizona, *so far as the waters named in the Bill of Rights are concerned,* and this has been repeatedly and distinctly held by this court consistently for many years. *Boquillas etc. Co.* v. *St. David etc. Assn., supra; Chandler* v. *Austin,* 4 Ariz. 346, 42 Pac. 483; *Arizona Copper Co.* v. *Gillespie,* 12 Ariz. 190, 100 Pac. 465, affirmed 230 U. S. 46, 57 L. Ed. 1384, 33 Sup. Ct. Rep. 1004.

To what waters was this doctrine applied?

In determining the meaning of words used in a statutory or constitutional provision, we must take into consideration the surrounding circumstances at the time when they were used, and they should be given a definition consonant with ideas then prevailing, rather than a technical meaning which may have attached to them perhaps a generation or more after they were first used. Article 22, *supra,* was adopted in 1864. At that time there was little, if any, knowledge in regard to subterranean waters, though it was

recognized that there were occasional cases in which these waters might be "rivers, lakes or ponds," in the same sense as those of that character above ground. Generally speaking, however, they were presumed to be percolating in their nature. It is unreasonable to attribute to the legislature in 1864 a purpose to use nontechnical language to express an idea which would not be anticipated by the men who were to be governed in their actions by that language; and to assume that in the use of the words "rivers, creeks or streams" and "rivers, lakes or ponds" it intended to include something which by the common understanding was given an entirely different classification would be absurd. We hold, therefore, that article 22 of the Bill of Rights applies only to surface rivers, lakes and ponds, as the words are ordinarily understood, and to subterranean waters of a similar character, and that its effect was to establish the doctrine of prior appropriation for such waters, and for them only, leaving percolating subterranean waters of all kinds untouched thereby. What, then, was the status of the latter?

In the same Code in which the Bill of Rights and the provision of the statute regulating the *method* of appropriation of certain waters described in the former were adopted, the legislature provided as follows:

"The common law of England, so far as it is not repugnant to, or inconsistent with, the constitution and laws of the United States, or the bill of rights or laws of this Territory, is hereby adopted, and shall be the rule of decision in all the courts of this Territory."

It cannot be contended a specific right to appropriate percolating waters was given by the clause adopting the common law, as above quoted, since no principle found in that law as it existed in England has ever been imagined to adopt affirmatively the doctrine of prior appropriation. Obviously, then, the

Howell Code left percolating subterranean waters as the property of the owner of the land, subject to the rules of the common law. We therefore should always remember, in discussing the law of prior appropriation as it now exists in Arizona, that, regardless of previous custom, its binding authority as general law and a declaration of the field which it covers is primarily *statutory,* so that many questions which in other jurisdictions have been determined as matters of judicial construction based on necessity, reason, analogy and convenience, with us merely involve an interpretation of the language of our statutes, using the ordinary statutory canons. For this reason many of the decisions from other states, based as they are on the necessity of supplying the lack of a statute on the subject, or on some peculiar local legislation, are not in point. *Slosser* v. *Salt River Valley Canal Co.,* 7 Ariz. 376, 65 Pac. 332.

But, it is suggested, even if this be true, the rule above set forth regarding what waters are subject to appropriation has been changed since by statute. The first change of moment in the language of the statutes referring to irrigation is found in Chapter 86, Session Laws of 1893, which reads as follows:

"Section 1. That any person or persons, company or corporation shall have the right to appropriate any of the unappropriated waters or the surplus or flood waters in this Territory for delivery to consumers, rental, milling, irrigation, mechanical, domestic, stock or any other beneficial purpose, and such person or persons, company or corporation for the purpose of making such appropriation of waters as herein specified, shall have the right to construct and maintain reservoirs, dams, canals, ditches, flumes and any and all other necessary water ways. And the person or persons, company or corporation first appropriating water for the purposes herein mentioned shall always have the better right to the same.

"Sec. 2. Every person or persons, company or corporation, who shall desire to appropriate any of

the waters of this Territory for the uses and purposes mentioned in Section 1 of this Act shall first post at the place of diversion on the stream or streams as the case may be, a notice of his, their or its appropriation of the amount of water by it or them appropriated. . . . ''

In 1912 Arizona became a state. Its constitutional provisions regarding water read as follows:

''Section 1. The common law doctrine of riparian water rights shall not obtain or be of any force or effect in the State.

''Section 2. All existing rights to the use of any of the water in the State for all useful or beneficial purposes are hereby recognized and confirmed.'' (See article 17, Ariz. Const.)

In 1919, chapter 164, commonly known as the Water Code, was adopted. Section 1 of that Code reads as follows:

''The water of all natural streams, or flowing in any canyon, ravine or other natural channel, or in definite underground channel, and of springs and lakes, belongs to the public, and is subject to beneficial use as herein provided. . . . ''

And section 3280, Revised Code of 1928, the latest declaration on the subject, is in the following language:

''The water of all sources, flowing in streams, canyons, ravines or other natural channels, or in definite underground channels, whether perennial or intermittent, flood, waste or surplus water, and of lakes, ponds and springs on the surface, belongs to the public, and is subject to appropriation and beneficial use, as herein provided. Beneficial use shall be the basis, measure and limit to the use of water. . . . ''

Reading these successive enactments, we think it is clear the legislature has never specifically made percolating waters subject to appropriation, and, if we apply the usual rule of ''*expressio unius*,'' has very carefully excluded them therefrom.

But, it may be said, when the legislature enacted paragraph 2935 of the Civil Code in 1887 in the following language: "The common law of England so far only as it is consistent with and adapted to the natural and physical condition of this territory, and the necessities of the people thereof, and not repugnant to, or inconsistent with the constitution of the United States, or bill of rights, or laws of this territory, or established customs of the people of this territory, is hereby adopted and shall be the rule of decision in all the courts of this territory," it in effect abrogated the previously existing common-law rule in regard to percolating waters, making them subject to appropriation by virtue of the language "so far only as it is consistent with and adapted to the natural and physical condition of this territory. . . . " Had the legislature never considered the question of water law specifically, or had it, after such consideration, confined itself to a mere adoption of the common law, either in the language of the Howell Code or the amendment of 1887, we might perhaps, like the courts of many of the western states in such a situation, in order to establish a system of law which we thought suitable to local conditions, have evolved a new common law from the stern school of necessity, and applied the law of prior appropriation to percolating waters.

It is true that the common law is not in its nature and character an absolute, fixed, and inflexible system; it is rather a system of general juridical truths, founded on reason, natural justice, and enlightened public policy, which are conditionally explained with the progress of society, and which adapt themselves to the gradual changes of that society and the conditions, exigencies, and usages of the country. It is never entirely stationary, but is modified and extended by analogous construction and custom so as

to embrace new relations springing up from time to time from an amelioration or change of society, or different physical conditions arising in the countries to which it is to be applied. Should it ever become so crystallized that its expressions must take the same form, irrespective of physical, social or other conditions, peculiar to the locality or the character and habits of the people, it would cease to be the common law, and become a rigid and arbitrary code. And we think, as suggested by the Supreme Court of the United States in *Boquillas etc. Co.* v. *St. David etc. Assn.*, *supra,* the doctrine of liberal interpretation set forth in paragraph 2935, *supra,* was equally implied in the Howell Code. But no judicial interpretation of the common law can ever prevail against an explicit declaration of public policy made by the legislature when acting within its jurisdiction. This declaration we have seen was made in the Bill of Rights and the Howell Code, and it has never been changed in substance up to the present.

In 1904, and after the adoption of Chapter 86, Session Laws of 1893, *supra,* and of paragraph 2935, *supra,* the question of the right to appropriate subterranean waters was before us in the case of *Howard* v. *Perrin,* 8 Ariz. 347, 76 Pac. 460; Id., 200 U. S. 71, 50 L. Ed. 374, 26 Sup. Ct. Rep. 195, and therein we held that waters percolating generally through the soil are the property of the owner, but that subterranean streams, flowing in natural channels between well-defined banks, are subject to appropriation under the same rule as surface streams. We reaffirmed that holding in the case of *McKenzie* v. *Moore,* 20 Ariz. 1, 176 Pac. 568.

It is urged by appellee that the statement to that effect in *Howard* v. *Perrin, supra,* was but *dicta,* and not binding upon this court, for the reason that it was based on an agreement of the parties to the

effect that as a matter of law percolating waters were not subject to appropriation. Whether such statement was, strictly speaking, *dicta* or not, it has been accepted as the law of this jurisdiction for so long, and so many rights have been based on it, that only the clearest showing that the rule declared was error would justify us in departing from it. Since the legislative branch of the government in the twenty-five years which have elapsed since the decision in the above case has not seen fit to contradict this interpretation of the law, but rather has confirmed it, we may reasonably assume we correctly stated its meaning.

We have read and carefully considered the various cases on this subject cited by counsel for appellee, such as *Yeo* v. *Tweedy,* 34 N. M. 611, 286 Pac. 970; *Sullivan* v. *Northern Spy Min. Co.,* 11 Utah 438, 30 L. R. A. 186, 40 Pac. 709; *Bower* v. *Moorman,* 27 Idaho 162, Ann. Cas. 1917C 99, 147 Pac. 496, and others following the rules laid down therein. For the reason above stated, to wit, that our first legislature, having the entire subject brought to its consideration in 1864, and being then practically unhampered by vested rights, made a complete determination of just which waters the doctrine of prior appropriation should be applied to, we decline to follow those cases in so far as they may be in conflict with the principles adopted by our legislative authorities and above stated by us.

Whether percolating waters in Arizona since the adoption of the Howell Code have been governed by the old English common law in its strictest form, or by the American modification known as the rule of correlative rights, as explained and defined in *Katz* v. *Walkinshaw,* 141 Cal. 116, 99 Am. St. Rep. 35, 64 L. R. A. 236, 70 Pac. 663, 74 Pac. 766, and the cases which follow it, based on the doctrine of *sic utere tuo*

*ut alienum non laedas,* we need not now decide. When the matter is properly before us, we will determine the rule which applies.

After carefully reconsidering the statutes from 1864 to the present time, our previous decisions, and the various reasons upon which they were based, we are of the opinion that our holding in *Howard* v. *Perrin, supra,* that percolating subterranean waters were not subject to appropriation, was and still is the law of Arizona.

But, while plaintiffs urge most ably and strenuously that percolating waters are subject to appropriation, and for that reason their rights are superior to those of defendants, no matter what the character of the waters used by them, they by no means admit that these waters are percolating in their nature, but insist that they are, on the contrary, subterranean waters running in channels with well-defined and known banks, and therefore of the class of waters admittedly subject to appropriation under the law of Arizona. And the trial judge obviously based his judgment upon this last theory.

The second question for our determination, therefore, is: What is the nature of the waters in question? Are they percolating, in any legal meaning of the term, or are they found running in well-defined channels, with known boundaries? In discussing this question we, of course, accept as axiomatic that, where there is a reasonable conflict in the evidence as to the existence of a fact, we are bound by the decision of the trial judge on that point. It is only where no reasonable man from the evidence could have reached such conclusion that we may set aside the decision as to the facts. This rule, however, does not apply to conclusions of law. The latter are always reviewable in the appellate court, and, indeed, that is its purpose. We think the best way to proceed

is to lay down the standards of law which the trial judge should have used in the case, and then apply them to the evidence as it was presented before him.

In the first place, the presumption is that underground waters are percolating in their nature. He who asserts that they are not must prove his assertion affirmatively by clear and convincing evidence. *Howard* v. *Perrin, supra; Ryan* v. *Quinlan,* 45 Mont. 521, 124 Pac. 512.

But, when it comes to the nature and *quantum* of the proof which meets this test, the question is one of great difficulty.

According to the great weight of authority the essential characteristics of a watercourse are a channel, consisting of a well-defined bed and banks, and a current of water. And the best reasoned cases go to the extent that without all these characteristics there can be no watercourse. *Lux* v. *Haggin, supra;* Angell on Watercourses, 1877, § 4; 1 Kinney on Irrigation, 2d ed., p. 490. The bed of a stream may be defined as that portion of the channel of a watercourse which carries the waters at their ordinary stage. In extremely high water the bed may be much more than submerged; at other times it may not even be covered, but by close examination of the bed and banks of a natural watercourse one may readily distinguish the exact line of demarcation between them. In all cases it is a natural object, and should be sought for, not merely by the application of abstract rules, but, like other natural objects, by the appearance it presents. The banks of a watercourse are the elevations of land which confine the waters to their natural channel when they rise to the highest point at which they are confined to a definite course and channel. 1 Kinney on Irrigation, 2d ed., pp. 492–494; *Howard* v. *Ingersoll,* 13 How. (54 U. S.) 381, 14 L. Ed. 189. Although at times these banks may be

overflowed by flood waters, yet they themselves are unchanged, though not necessarily unchangeable.

The third element necessary to a watercourse is not only water from a definite source of supply, but it must be running water, though it need not run continuously. It is not sufficient to constitute a watercourse that there is a mere surface drainage over the face of a tract of land occasioned by unusual freshets or other extraordinary causes. *Lux* v. *Haggin, supra; West* v. *Taylor,* 16 Or. 165, 13 Pac. 665; *Sanguinetti* v. *Pock,* 136 Cal. 466, 89 Am. St. Rep. 169, 69 Pac. 98.

This element of a current is one of the controlling distinctions between a river or stream, and a pond or lake. In the former case the water has a natural motion or current, while in the latter the water is in its ordinary state substantially at rest, with its surface perpendicular to a radius of the earth. The *exit* of a lake is a river or stream, having a current, but the lake itself has substantially none. These characteristics, we think, are necessary to constitute a river, creek or stream on the surface, and, as we have said, subterranean waters, to come within the same classification, must have substantially like characteristics with surface water. *Howard* v. *Perrin, supra; Pima Farms Co.* v. *Proctor,* 30 Ariz. 96, 245 Pac. 369; chapter 164, Session Laws 1919, *supra;* section 3280, *supra.*

What, then, is the nature of the proof required to establish that an alleged subterranean stream has definite banks, a bed and a current?

It is urged by defendants that the only method whereby this may be proved is through such indications as men of ordinary powers could with reasonable diligence ascertain from an examination of the surface, without resort to scientific speculation or surmise, and in support thereof they cite such cases

as *Clinchfield Coal Corp.* v. *Compton,* 148 Va. 437, 55 A. L. R. 1376, 139 S. E. 308; *Ryan* v. *Quinlan, supra; Hayes* v. *Adams,* 109 Or. 51, 218 Pac. 933; *Barclay* v. *Abraham,* 121 Iowa 619, 100 Am. St. Rep. 365, 64 L. R. A. 255, 96 N. W. 1080. While surface indications such as trees, shrubs, bushes and grasses growing along the course and the topographical features of the surface are the simplest and surest methods of proof, we think they are by no means exclusive. Other methods may be used, such as a series of wells or borings, tunnels, the color and character of the water, the sound of water passing underneath the earth, the interruption of the flowing of other wells on the line of the alleged subterranean stream, geologic formation, and perhaps others. But all of these, when examined, must be such as to afford clear and convincing proof to the satisfaction of a reasonable man, not only that there are subterranean waters, but that such waters have a definite bed, banks and current within the ordinary meaning of the terms as above set forth, and the evidence must establish with reasonable certainty the location of such bed and banks. It is not sufficient that geologic theory or even visible physical facts prove that a stream *may* exist in a certain place, or probably or certainly does exist *somewhere. There must be certainty of location as well as of existence of the stream before it is subject to appropriation.* With these rules of law for application to the evidence, let us examine the latter and see whether it sustains the findings of ultimate facts made by the trial court.

The vital finding, so far as this phase of the case is concerned, reads as follows:

"At all times there is a surface flow in said river at and for a long distance above a point two or three miles below Camp Dyer, where it sinks in the bed of the river. . . .

"All of said waters so sinking into and absorbed by the bed of said river as aforesaid join the subflow of said river and or flow into and through *known, definite, dependent underground channels extending laterally from various points along and beneath the bed of said river to and under the lands, wells and pumping plants of the plaintiffs,* which said known, definite, dependent underground channels run in a general southerly direction and have their ultimate outlets in the Gila River. All of said known, definite, dependent underground channels are interconnected and in contact with and have their sources in the Agua Fria River and are dependent on the discharge of said river at Camp Dyer for practically all of their waters. Said known, definite, dependent underground channels may hereinafter be designated as underground channels of the Agua Fria River." (Italics ours.)

Without this finding the judgment of the trial court, so far as it grants a right of appropriation to the waters of the wells pumped by plaintiffs, except perhaps a very few located in or near the surface channel of the Agua Fria River, cannot be sustained. We consider, therefore, the evidence on which the court must have based its findings.

The record in this case is of great length, and we have examined it carefully. We think it unnecessary to quote from the evidence, but, taking it in the most favorable manner on behalf of plaintiffs, as we must do, it shows the following ultimate facts:

The great central Arizona plain, commonly known as the Salt River Valley, in its broadest extent stretches, roughly speaking, from the Superstition Mountains on the east to the White Tanks on the west, from the Salt River Mountains on the south to the Hieroglyphic and Cave Creek Mountains on the north, and in the center of this area rise the Phoenix Mountains, a small isolated mass. It is approximately a maximum of forty miles in width and sixty miles in length, and the mountains above re-

ferred to do not surround it completely, but are broken by other large valleys, such as the Hassayampa and the Gila, opening into it. A number of surface streams enter it on the northern and northeastern sides, the principal ones being the Salt, the Verde, and the Agua Fria Rivers. The first two naturally flow permanently throughout their entire course in the valley, in greater or lesser amounts. The last named, the one whose waters are in controversy in this case, is intermittent in its character below the place where it debouches from the mountains. The surface waters of all of these streams, if their course is not interrupted, eventually find their way into the Gila, and mingle and pursue a southwesterly course to the Colorado River, and thence to the Gulf of California. Underlying substantially the entire valley at a depth of from a few feet to perhaps a hundred or more is found an immense quantity of subterranean water, which extends downward into the earth to a great distance. There is apparently a slow but steady movement of this entire quantity of water southwesterly until it presumably reaches and mingles with the underground waters of the Gila Valley.

So far as surface indications show, there are no underground channels of running water in the sense defined above under or near any of the land of plaintiffs except directly beneath the surface bed of the Agua Fria River. The country is apparently the ordinary Arizona desert, with the usual desert growth, furrowed by occasional torrential rains. Practically the only evidence bearing on the nature of these underground waters is based on the character of the water in various wells in the valley, and presumptions drawn from geologic theories. These theories, if correct, tend to show that ages ago the entire Salt River Valley was a vast depression, surrounded by its pres-

ent mountain ranges, and that over a period of countless years the rivers in question, together with other torrential, intermittent streams, have emptied their waters into this great basin, carrying down enormous quantities of boulders, gravel, sand and other detritus, which spread out through the valley in the manner usual under such conditions. The then surface channels of these streams apparently changed from time to time, and, as they changed, the character and location of the deposits also changed from fine to coarse, and back again. After a length of time which can only be estimated in geologic periods, the valley filled to its present level, and during historic times has remained substantially as now. Whenever, therefore, any of the rivers in question carry water enough to flow from the mountains, a great percentage of this water sinks into the more or less permeable material with which the valley is filled, and, since it slopes in a more or less general direction toward the Gila Valley, these waters gradually move in that direction. Since the detritus with which the valley is filled is coarser in some places than in others, the tendency of the water is to accumulate in greater quantity where the material is coarse than where it is fine, and to move more rapidly therein, and these bodies of coarse material, with finer presumably above, beneath, and beside them, are what are called by plaintiffs subterranean watercourses.

But, admitting this theory to be absolutely correct in its deductions, there is not a scintilla of evidence in the record from which the ordinary man, or even the trained scientist, could point out definitely a specific place where any one of these so-called subterranean watercourses begins, where it ends, or how far its banks extend. Counsel for plaintiffs contends that the true condition of the underground soil and water in the present case is very similar to that

set forth in the case of *Miller* v. *Bay Cities Water Co.,* 157 Cal. 256, 27 L. R. A. (N. S.) 772, 107 Pac. 115:

"There can be no doubt but that it was as clearly proven under the evidence as such matters can be proven that there are underlying a vast territory in the . . . valley — some . . . miles square—numerous channels created by the . . . river through its action in ages past when, in the building up and forming of the valley, its waters rushed in enormous quantities from the mountains, changing from one side of the valley to the other, and constantly varying its course in its flow . . . towards the . . . These old channels now lie beneath the surface of the valley at varying depths; channels beside channels, and channels crossing and interconnecting with each other, through each of which the . . . river once flowed in its open course, but which are now underground channels filled with loose and coarse gravel, through which waters still flow, supplied to them through percolations from the . . . river, with which these old gravel channels have always been connected, and that the particular underground channel or gravel stratum from which the well of plaintiff is supplied constitutes one of these old channels, which is likewise connected with and supplied from the waters of . . . river. The intake of all these old channels, including that from which the plaintiff derives his water, is in the enormous bed of gravel extending several miles. . . . Into this vast gravel bed during the winter and spring, when the storm waters gather . . . and discharge themselves, . . . there sink into these gravels immense quantities of water, in amount limited only by the extent of the rainfall, but in any season of flood extending largely into hundreds of millions of gallons per day. . . . It is quite clear that these quantities of waters sink into the gravels and fill up the various branch channels underlying the valley, which connect with these gravels by the pressure of the storm waters passing over them, and the supply of these underground channels is obtained in no other way; and it is equally clear that the intake into these gravel beds and the graveled strata along the

flow of the river generally is in proportion to the height and breadth of the storm waters passing over them, and the consequent pressure they exert to increase the percolation of the waters in the vast gravel bed and gravel strata. That the waters which lie in these old branch channels are supplied by the percolation of waters into the gravel beds and strata from the storm waters of the . . . river is beyond question from the evidence, as it equally appears that the flow of these storm waters during the recurring heavy rains is absolutely necessary to sustain the supply of water thereto which would otherwise and in a few years be exhausted,''

and that, if we substitute in the appropriate blanks the words ''Salt River'' and ''Agua Fria,'' the parallelism is complete.

But, even if we admit the statement of the facts in the case just cited is almost exactly like the facts as the evidence shows them to exist herein, as we shall show, the very reasoning used by the California Supreme Court to sustain its judgment demonstrates conclusively that it was based on an interpretation of the doctrine of prior appropriation directly opposed to that prevailing in Arizona. We quote from the opinion as follows:

''But, it is insisted by appellants that this rule only applies as to correlative rights of different persons owning lands overlying the same plane of percolating waters, and does not apply so as to entitle a nonriparian owner, although the stratum underlying his land is directly supplied by waters percolating from the stream to prevent the diversion of the waters of the stream by an appropriator. The precise question as to the respective rights of an appropriator of water to be used beyond the watershed, and of one claiming an uninterrupted flow of these waters to supply, by percolation, a water-bearing stratum underneath his land and connected with the stream, has not been heretofore presented. But there are general principles of law which have been applied as between other appropriators of the stream waters

and claimants to the flow or to the percolating waters of the stream which are equally applicable as between the parties to this action. It is true in this case that the plaintiff is not a riparian owner, but neither does it appear, as far as their rights are here asserted, that appellants are. They are only asserting rights as appropriators under a claim that they have appropriated all the surplus waters of the Coyote river, and are entitled to certain impounded waters between the gorges. Be that as it may, however, as far as any waters of the river are concerned (there being no impounded waters), we do not perceive that the fact that the plaintiff is not a riparian owner can affect his rights as against the appellants. As between riparian owners, it is conceded, as the law declares, that one riparian owner is not entitled to divert the waters of a stream for use at some distant point for commercial purposes so as to prevent another riparian owner to whom they would otherwise be available from using them on his lands, and it is established by the authorities to which we have heretofore referred that, as between owners of land overlying a common substratum of percolating water, this cannot be done. This being so, we perceive no reason why the same rule should not be applied as between owners of land overlying a substratum of water directly connected with either the surface or subsurface flow of the stream, and deriving practically its exclusive supply from that source. *The theory upon which the right of a riparian owner to be protected in the use of the waters of a stream to which his lands are riparian is that, nature having given these lands the benefit of the flow, and the natural advantage of its use on the lands, one riparian owner may not divert these waters to lands not riparian, to the injury of another riparian owner who can use them. The same principle has been applied, as we have seen, to the use of waters as between the owners of lands, overlying a common stratum of percolating waters. And we perceive no reason why the same principle should not be applied as between an appropriator of the waters of a stream to be taken beyond the watershed for commercial purposes and the owners of lands overlying an artesian stratum which is conclu-*

*sively shown to be so connected with the stream as to derive its supply of water by percolation therefrom to this stratum.* Why, in principle, should there be any distinction? With the common-law doctrine modified to meet the conditions in this state necessitating it, and modified so as to preserve to each owner of lands overlying a common stratum of percolating waters a right to a fair and reasonable use of these waters of which their lands have a natural advantage, no reason suggests itself why the same rule should not apply as between the appropriators of the waters of a stream for use elsewhere than on riparian lands and the owners of lands overlying a water-bearing channel, so directly connected with the stream as to be supplied by percolation from it. The conditions in all cases are analogous as far as the natural supply of waters is available for use upon the lands concerned, whether the lands be riparian to the stream or overlying a common subterranean stratum, or whether the underlying strata are connected and supplied directly from the flow of the stream itself. *In either case there is a natural supply of water of which the lands by reason of their location, either as riparian or above a common subterranean stratum, or as lying over a water-bearing stratum supplied by percolation from the stream, have a natural advantage to the use of the waters.''* (Italics ours.)

In other words, since one owner of riparian lands had rights in the water against another riparian owner, and one owner of lands over percolating water had rights in the water against another owner of land over the same water-bearing strata, *in both cases by virtue of the location of their lands and under the common law, as modified by the California decisions,* the rights of an *appropriator* were governed by the same test, viz., *location of lands and common law.* The answer to this is that the fundamental principle of the doctrine of appropriation as it exists in Arizona is that *the location of land and the rules of the common law give no rights as against an appropriator,* so long, at least, as his lands lie

within the watershed of the stream. And we would further point out that in the case cited the lands of the appropriator of surface water lay *without* the watershed, while in the instant case they lie within it.

The decision in *Miller* v. *Bay Cities Water Co., supra,* based as it avowedly is on a theory of the law of appropriation absolutely inconsistent with ours, is of no value as a precedent for sustaining the judgment before us for review. The only theory on which our courts could have reached the same result on the stated facts of that case is that subterranean waters of the nature therein described are subject to appropriation under the law of Arizona. But the statement of facts shows that to be untrue. Without considering the use of the word "percolating" in the opinion as having any bearing on the question, the channels described therein fail to show any definite beginning, end, or location. The most that can be said is that *somewhere* beneath the surface of the Santa Clara Valley geological theory teaches us there are subterranean channels, and the proof in this case leads, at the most, to the same conclusion as to the lands involved herein. This is utterly insufficient under our law to base an appropriation of water on. The decree of the trial court, so far as it adjudges plaintiff a right of prior appropriation to the water of any wells not in or immediately adjacent to the surface channel of the Agua Fria River, cannot be sustained on the ground that such water comes from either dependent or independent underground channels with known and definite banks from which appropriations may be made under the law of Arizona.

But it may be said, even admitting the waters claimed by plaintiffs are not subject to appropriation as those of known and definite independent or dependent underground channels, they are nevertheless subject to appropriation as being the subflow of the Agua

Fria River. The underflow, subflow or undercurrent, as it is variously called, of a surface stream may be defined as those waters which slowly find their way through the sand and gravel constituting the bed of the stream, or the lands under or immediately adjacent to the stream, and are themselves a part of the surface stream. 2 Kinney on Irrigation, 2d ed., par. 1161.

As the names given to this class of waters indicate, physically they constitute a part of the surface stream itself, and are simply incidental thereto, and also in the main depend on the surface streams to which they are incident for the greater part of their water supply. The best test which can be applied to determine whether underground waters are as a matter of fact and law part of the surface stream is that there cannot be any abstraction of the water of the underflow without abstracting a corresponding amount from the surface stream, for the reason that the water from the surface stream must necessarily fill the loose, porous material of its bed to the point of complete saturation before there can be any surface flow. Therefore the river bed must continue holding sufficient water to support the surface stream, as it were, for otherwise in drawing on the underground flow of the stream it will necessarily draw upon the waters flowing on the surface. *Montecito Valley Water Co.* v. *Santa Barbara*, 144 Cal. 578, 77 Pac. 1113; *Smith* v. *Duff*, 39 Mont. 382, 133 Am. St. Rep. 587, 102 Pac. 984; *Verdugo, etc.,* v. *Verdugo*, 152 Cal. 655, 93 Pac. 1021.

If the bed of a stream is not solid rock, but gravel or earth, water will always be found many feet beneath its surface, and there may and probably will be corresponding to the flow on the surface a current beneath it. Not only does it move along the course of the river, but it percolates from its banks from

side to side, and the more abundant the surface water the further will it reach in its percolations on each side. But, considered as strictly a part of the stream, the test is always the same: *Does drawing off the subsurface water tend to diminish appreciably and directly the flow of the surface stream?* If it does, it is subflow, and subject to the same rules of appropriation as the surface stream itself; if it does not, then, although it may originally come from the waters of such stream, it is not, strictly speaking, a part thereof, but is subject to the rules applying to percolating waters. *Vineland Irr. Dist.* v. *Azusa, etc.*, 126 Cal. 486, 46 L. R. A. 820, 58 Pac. 1057. Nor are we aware of any decision where a right in such percolating waters based on the doctrine of prior appropriation as it exists in Arizona is recognized. Any such rights are necessarily based on some form of riparian rights, as in *Miller* v. *Bay Cities Water Co., supra,* on the doctrine of *sic utere tuo,* as in *Katz* v. *Walkinshaw, supra,* or a local statute.

In almost all cases the so-called subflow is found within, or immediately adjacent to, the bed of the surface stream itself. *McClintock* v. *Hudson,* 141 Cal. 275, 74 Pac. 849; *Vineland Irr. Dist.* v. *Azusa, etc., supra; City of Los Angeles* v. *Pomeroy,* 124 Cal. 597, 57 Pac. 585. The leading case on the subject in California, which state has probably witnessed more disputes over subterranean waters than any other, is *City of Los Angeles* v. *Pomeroy, supra,* and therein the doctrine of subflow has been extended as far as it can reasonably be carried, if the definitions and tests above set forth are to be adhered to. It appears from the facts therein that the San Fernando Valley, which is about twelve miles wide by twenty-four miles long, is composed of more or less permeable material, which is practically filled with water from rains, mountain torrents, etc. It ends in a lower neck or

gorge, about two miles wide, through which all the waters of the valley eventually flow, and it was attempted to establish an appropriation under the ancient pueblo right of the city of Los Angeles to the subterranean water *flowing through this two-mile gorge* as being, in effect, the subflow of the Los Angeles River, and a part thereof. The trial court defined subterranean watercourses, and this definition was approved by the Supreme Court, as follows:

"A water course must consist of beds, banks, or sides, and water, and the water must be flowing in a channel or course more or less defined. . . . Water moving by force of gravity in a valley or basin of wide extent,—say, twenty-four by twelve miles at the extreme extent,—and moving generally through the whole or through a large portion of the basin, along through the natural voids or interstices of the earth, composed of alluvial or other deposit lying throughout the entire basin, and made up of loam, sand, gravel and bowlders, mixed together, and interspersed with irregular and broken strata or masses of clay or cemented sand and gravel, and lying in place as originally deposited by the forces of nature, do not constitute a water course, but are a part of the land, and belong to the owner of land as fully as any other constituent part of it. . . . But if such water does collect underground and flow in certain courses or channels through coarse, permeable material therein, where the existence and general course of the flowing or moving body of water can be easily determined, then the water so moving in such channels would constitute a water course, although not visible on the surface, and although the space through which the channel extends may be largely filled with the material through which the water flows."

And the opinion points out that the evidence showed the water claimed to be subflow complied with the tests above stated, to wit, that it lay substantially beneath the surface of the bed of the Los Angeles River, and that drawing off the underground water

would diminish the surface flow. We think the body of water shown to exist beneath the lands of plaintiffs, and from which they draw by reason of their wells, even within the liberal doctrine laid down by the Pomeroy case, does not constitute the subflow of the Agua Fria River, for there is not the slightest evidence that their pumping diminishes directly or appreciably the surface flow, no matter how true may be the converse.

It is true that in the later case of *City of Los Angeles* v. *Hunter,* 156 Cal. 603, 105 Pac. 755, the court said:

"Unquestionably the San Fernando valley is the great natural reservoir and supply of the Los Angeles river. Unquestionably the cutting off of this supply would as completely destroy the Los Angeles river as would the cutting off of the Great Lakes destroy the St. Lawrence. San Fernando valley may indeed be regarded as a great lake filled with loose detritus, into which the drainage from the neighboring mountains flows, and the outlet of which is the Los Angeles river. Impeded by the soils, these waters, of course, move more slowly than they would in an open lake; but unquestionably the general movement of practically all is southeasterly to the Narrows, through and out of which flows the Los Angeles river proper. Unquestionably, also, a serious interruption of or interference with this supply would as certainly impair the volume of water carried by the Los Angeles river as though the interruption and interference were with a surface flowing tributary thereof. The waters of the San Fernando valley therefore are not 'percolating waters' in the common-law sense of the term—vagrant, wandering drops moving by gravity in any and every direction along the line of least resistance. These waters percolate, it is true, but only in the sense that they form a vast mass of water confined in a basin filled with detritus, always slowly moving downward to the outlet, in the effort, in conformity with physical law, to attain a uniform level."

This is a positive statement that the waters of the San Fernando basin are not percolating in the common-law sense of the term, but it also by implication denies that they are the subflow of the Los Angeles River. The contention is that the valley is in effect a lake, of which the river is the outlet, and that an appropriation of the waters of a river which is the outlet of a lake is also an appropriation of the waters of the lake. This conclusion of law is of course correct if the waters indeed be those of a lake. *Cole* v. *Richards Irr. Co.*, 27 Utah 205, 101 Am. St. Rep. 962, 75 Pac. 376; *Ryan* v. *Quinlan, supra.*

But whether or not under the facts the San Fernando Valley is indeed a lake, supplying the Los Angeles River, the evidence in this case shows conclusively one fact which negatives the theory that the water involved herein constitutes a lake of appropriable water under the law of Arizona. The surface of the water underlying plaintiff's lands, and indeed under the entire valley, so far as it is known, instead of being perpendicular to a radius of the earth, as is invariably the case with a surface lake, has a decided slope or dip to the south and west. Whatever this water may be, it is not a ''lake'' in the sense in which our statutes use the word. Whether it be diffused percolations in the common-law sense of the term, as defined in *City of Los Angeles* v. *Hunter, supra,* so that the extreme English doctrine applies thereto, or whether it be percolating waters whose extraction will tap other waters, and it therefore comes within the doctrine of correlative rights as developed in *Katz* v. *Walkinshaw,* and other cases which follow it, is immaterial in this instance, for neither class is subject to appropriation under the law of Arizona, which limits that right, so far as subterranean waters are concerned, to those similar to appropriable surface waters. Plaintiffs can claim

no rights of appropriation to the waters pumped by them as a subflow of the Agua Fria River except such as comply with the test above laid down, to wit, that they are in the bed of the river, or so near thereto that the pumping from them will appreciably deplete the waters of the surface stream.

It is evident from what we have already said that the judgment of the trial court must necessarily be reversed and the case remanded for a new trial. In order, however, that all the issues which will arise at such trial may be properly determined, we think it advisable to discuss one or two other points. The waters claimed by plaintiffs may be divided into three classes. First are those pumped from wells not in or immediately adjacent to the bed of the Agua Fria River. To these, as we have stated, plaintiffs can claim no right by reason of *appropriation,* whatever may be their rights under the law applying to percolating waters of the classes we have mentioned in this opinion. The second is of waters of wells in or immediately adjacent to the bed of the Agua Fria River, so that the evidence shows they satisfy the tests applying to subflow, or are actually in the subterranean channel of the river itself. So far as these are concerned, if the evidence shows plaintiffs have applied them to beneficial use, and have not since forfeited or abandoned such use in whole or in part, they are entitled to have any rights so acquired protected. The third class consists of surface water alleged to have been diverted at what is known as the Marinette heading. The trial court should determine the amount of water obtained from these two sources and used beneficially in accordance with the principles stated by us, and plaintiffs are entitled either to have sufficient water pass the point of diversion of defendants so that enough will reach the point of diversion of plaintiffs to supply their appro-

priation as it would have been supplied were it not for defendants' dams and canal, or in lieu thereof defendants may, if they desire, under the doctrine of *Pima Farms Co.* v. *Proctor, supra,* deliver the proper amount of water to plaintiffs, the cost of such delivery to be no greater to plaintiffs than drawing the water from the original points of diversion has been in the past, or would be in the future were it not for defendants' operations.

Defendants have also urged that their right of appropriation is prior to that of plaintiffs under any theory of the case, and that plaintiffs have not denied this. Whether the denial was formally made in the pleadings or not, doubtless at a retrial of the case they will be amended to meet that objection, and we think it best to refer to the evidence on this point as though the issue were properly before the trial court. Defendants' predecessor in interest did, at some time during the year 1888 initiate an appropriation of the waters of the Agua Fria River flowing at Frog Tanks and Camp Dyer, and expended considerable money thereafter in the construction of a diversion dam at the last-named place, and a canal for the irrigation of various lands. The diversion dam and canal, however, were practically destroyed, and all work thereon stopped in the year 1895. From that time on until approximately 1925 substantially the only work done in furtherance of these initiated rights was the maintaining of a watchman at the point of diversion and the expenditure of some $25,000 for surveys and attorney's fees.

Under the doctrine of prior appropriation, an appropriator is required, after his rights have been initiated in accordance with the law in existence at the particular time and locality, to exercise reasonable diligence in every step required to make his appropriation complete, by the actual application of the

water to a beneficial use, for until he does this his rights are inchoate. When the water is finally so applied, his perfected rights relate back to the initiation of the appropriation. *Sieber* v. *Frink,* 7 Colo. 148, 2 Pac. 901; 2 Kinney on Irrigation, 2d ed., p. 1282. If, however, he fails to use reasonable diligence, his rights commence only as of the time of actual application of the water. The time within which the appropriation must be completed varies according to circumstances, as what may be reasonable diligence in one case may be a great lack of diligence in another, and the courts have always considered in the case of *bona fide* settlers that they might take a longer time in the construction of their works for the diversion of water and in the actual application of the water to a beneficial use than was required of those with ample means. But the mere lack of means with which to prosecute the work is never *ipso facto* a sufficient excuse for delay. As was well stated in the case of *Ophir Silver Mining Co.* v. *Carpenter,* 4 Nev. 534, 97 Am. Dec. 550: "It would be a most dangerous doctrine to hold that ill-health or pecuniary inability of a claimant of a water privilege will dispense with the necessity of actual appropriation within a reasonable time, or the diligence which is usually required in the prosecution of the work necessary for the purpose." See, also, *Cole* v. *Logan,* 24 Or. 304, 33 Pac. 568; *Mitchell* v. *Amador C. & M. Co.,* 75 Cal. 464, 17 Pac. 246. Particularly is this true when the delay is due to the difficulty of financing a large project. *United States* v. *Whitney,* (C. C.) 176 Fed. 593; *Nevada etc. Co.* v. *Kidd,* 37 Cal. 282.

In the case at bar we are satisfied that defendants failed to show due diligence in perfecting their predecessor's appropriation of 1888, and the trial court correctly held that the rights of plaintiffs, so far as such

rights existed at all, were prior to those of defendants.

There are a number of other assignments of error, but we think we need not refer to them specifically, as what we have said previously will afford sufficient information to the trial court to determine the questions raised thereby. In passing we may say that we recognize the far-reaching effect which this reiteration of the fundamental principles of the water law of Arizona may have on the future development of the state, and the momentous results which may flow therefrom. On the one hand, counsel for plaintiffs have told us that a reversal of this case will in effect be a re-establishment of the doctrine of riparian rights, an abandonment of the law of prior appropriation, and a permanent end to our future agricultural growth, while with equal sincerity and earnestness counsel for defendants insist that an affirmance of the judgment will be a declaration that storage is subservient to pumping, and that this will prevent all future development of our surface waters, thus limiting our agricultural increase to small and uncertain areas. Such appeals, while doubtless legitimate and pertinent if addressed to a legislative body declaring a rule of public policy, cannot be considered by the courts when that public policy already appears plainly in the statutes of the state, and our decision is based solely on the law as it is, and not on what we think it should be or its effect. But could we consider the wisdom of the adoption of the respective principles of law presented by counsel our decision would be the same. When fundamental public policy is to be settled, the final test is well stated in the old Roman maxim of *"salus populi est suprema lex."* And we are of the opinion that the greatest permanent good of the state of Arizona is best served by the doctrine laid down by our legislatures in the past and explained by us in this decision.

Surface waters are plainly visible, definitely ascertainable, and the effect of their appropriation generally easily foreseen and understood by all. Subterranean waters are necessarily more or less uncertain as to their very existence, speculative as to their character, and frequently incapable of an immediate demonstration of the results of their appropriation of such a nature that investors may safely stake their funds and farmers their future on the success of the project. If percolating waters are subject to the law of prior appropriation, and if appropriations of other subterranean waters may be established by mere surmise, inference or possibility, the field is open to interminable and uncertain litigation from which none will profit in the end but members of the legal profession, and there will in all probability be a complete cessation of extensive development work, due to the impossibility of ascertaining in advance just what rights will be acquired thereby. It may be said that this rule means an end to all future large pumping projects. If these projects are based on the depletion of surface waters, it is far more economical both in money and water, and thus better for the state as a whole, that those surface waters be utilized through surface developments, as they doubtless will be when necessity arises. If, on the other hand, they are based on a use of water which will not affect surface developments, past or future, there are other principles of law, not necessary for the determination of this case, which, properly applied, will do justice to the state and to its individual citizens alike. While it may be, and doubtless is, true that the effect of the declaration of public policy made by our legislature so long ago will be to lessen somewhat the number and size of future irrigation projects depending upon pumped water, in our opinion it is more than compensated by the establishment of cer-

tainty and security for the vastly· more important surface projects now existing, and which will doubtless exist in the future.

The judgment of the superior court of Maricopa county is reversed and the case remanded, with instructions to grant a new trial in accordance with the principles laid down in this opinion.

McALISTER, C. J., and ROSS, J., concur.